**Attorney General Patrick C. LYNCH**

v.

**RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT et al.**

Nos. 2008–235–M.P., 2009–57–Appeal.

Supreme Court of Rhode Island.

May 5, 2010.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, and
ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

This appeal ultimately derives from a decision by the Department of Environmental Management (DEM) in 2003 to issue a license to operate a refuse facility in the City of East Providence. We are called upon to determine whether the administrative appeal of the plaintiff, Attorney General Patrick C. Lynch, from the issuance of that 2003 license has been rendered moot by the expiration of, subsequent renewal of, and later transfer of said license.[1]

For the reasons set forth herein, it is our opinion that the issue of the validity (*vel non*) of the 2003 license is not moot. Accordingly, we grant the Attorney General's petition for certiorari and quash the judgment of the Superior Court.

## I

### Facts and Travel

Pond View Recycling, Inc., the predecessor in interest to defendant TLA–Providence LLC (TLA),[2] operated a refuse facility in East Providence that was allowed to receive up to 150 tons per day of construction and demolition debris.[3] Between Au-

Terrence J. Tierney, Department of Attorney General, for Plaintiff.

John A. Langlois, Sr., Esq., Department of Environmental Management, for Defendant.

1. We wish to thank the *amici curiae* for the helpful briefs that they submitted to this Court.

2. The sale of the assets of Pond View Recycling, Inc. to TLA–Providence LLC is discussed later in this "Facts and Travel" section.

3. It should be noted that, pursuant to G.L. 1956 § 23–18.9–8(c), "[p]rocessing facilities

that accept less than one hundred and fifty (150) tons per day of construction and demolition debris (C & D) are exempt from the requirement of obtaining a solid waste management facility license * * *." Such facilities are, however, subject to the other requirements, rules, and regulations that are set forth in that statute.

gust of 2000 and July of 2002, Pond View began the process of applying for a DEM license pursuant to which it would be able to operate at a 500 tons per day capacity. See G.L. 1956 § 23–18.9–9.

A public hearing was held on September 10 and September 11, 2002 with respect to that license application. At the hearing, the Attorney General provided "substantive comment" to DEM in opposition to the issuance of the license. See § 23–18.9–9(a)(4) through (6). The Attorney General cited what he considered to be (1) Pond View's noncompliance with state environmental laws and (2) its failure to have obtained the permits and/or licenses required for operation as constituting cause for denial of the license; the Attorney General further contended that Pond View's pending application contained numerous deficiencies.

Thereafter, on January 10, 2003, DEM issued Pond View the sought-after license to operate at a 500 tons per day capacity. It should be noted that § 23–18.9–9(c) provides that such "[l]icenses shall expire three (3) years from the date of issuance unless sooner suspended or revoked." Accordingly, the license issued to Pond View would in the normal course have expired on January 10, 2006.

On April 1, 2003, the Attorney General, acting pursuant to § 23–18.9–9(a)(6), commenced an administrative appeal of the issuance of the license. In connection with that appeal, he requested a hearing before the Administrative Adjudication Division for Environmental Matters (AAD)—a division within DEM. In his appeal, the Attorney General contended that DEM had violated its own rules and regulations in issuing the license to Pond View.

Hearings before the AAD with respect to the Attorney General's appeal began on April 12, 2004.[4] On May 14, 2004, the chief of the DEM's Office of Waste Management testified at the AAD hearing pursuant to a subpoena issued by the Attorney General. However, while that witness was being questioned, counsel for DEM objected to a question posed by the Attorney General; counsel for DEM contended that the question at issue called for improper expert opinion testimony. The hearing officer overruled the objection, noted the objection for the record, and told the witness, "[Y]ou may answer the question." Nonetheless, counsel for DEM then instructed the witness not to answer the question.[5] The hearing officer indicated

---

**4.** After the Attorney General's appeal was filed, but prior to the commencement of the AAD hearings, the parties made attempts to reach a mutually acceptable resolution through voluntary mediation. However, such attempts proved fruitless, and discovery continued thereafter.

**5.** The following excerpt from the transcript of the AAD hearing, on May 14, 2004, provides the context of the evidentiary objection at issue:

"[Attorney General]: Do you employ or have occasion to consult the Department's promulgated rules and regulations?
"[Witness]: Yes.
"[Attorney General]: And which rules and regulations are we referring to that you use?

"[Witness]: For what?
"[Attorney General]: For decisions and recommendations that you make relative to licensing and permitting in the solid waste area of the duties within your office.
"[Witness]: It would be primarily the solid waste rules and regulations, at least the rules and regulations for solid waste, management facilities, compost facilities.
"[Attorney General]: And do those regulations contain provisions relative to construction, demolition, and debris processing facilities?
"[DEM counsel]: Objection. Calls for expert testimony.
"* * *
"[Hearing Officer]: My ruling is what is being elicited right now, what this question is asking is not expert testimony. Over-

on the record that, pursuant to G.L. 1956 § 42–17.7–8, she did not have the authority to compel the witness to testify; it was her view that that authority is exclusively vested in the Superior Court.

At that point, the AAD hearing proceedings were stayed while the Attorney General filed a declaratory judgment action, in which he sought a ruling from the Superior Court enforcing the subpoena and compelling the witness to testify. Ultimately, on December 31, 2007,[6] a justice of the Superior Court ordered the witness who had been under subpoena to *"comply with the Hearing Officer's directive to answer questions calling for factual or opinion evidence."* (Emphasis added.)[7]

On January 4, 2008, after the stay of proceedings had been lifted and after the Superior Court issued its above-referenced order, the AAD hearing officer heard oral argument with respect to Pond View's motion to dismiss the administrative appeal (which motion had been filed during the time when the proceedings were stayed). At the hearing on the motion, Pond View contended that the controversy was moot and that the appeal should therefore be dismissed. Pond View argued that the 2003 license had expired on January 10, 2006. Pond View further indicated that a new license had been issued on January 10, 2006 (which would in the normal course expire on the same date in 2009), and it contended that the Attorney General had not preserved his right to challenge the issuance of the 2006 license. Lastly, Pond View relied on the doctrine of laches; it alleged that there had been unreasonable delay on the part of the Attorney General in prosecuting the case.

The Attorney General objected to Pond View's motion to dismiss. He contended that the controversy was not moot because the AAD had yet to reach a final decision as to the validity of the underlying 2003 license. The Attorney General additionally pointed to the unresolved constitutional and due process contentions that he had articulated with respect to the manner in which DEM conducts its administrative proceedings. The Attorney General further contended that, because the 2006 license was in actuality a renewal of the 2003 license (the latter being the subject of the administrative appeal), "[i]t is self-evident that if the original license is eventual-

ruled. * * * The witness may answer. I have your objection on the record * * *. It is noted. [Witness], you may answer the question.
"* * *
"[DEM counsel]: I'm instructing my client not to answer the question, please."

6. In May of 2005, while the declaratory judgment action was still pending in Superior Court, the Attorney General filed a petition with the director of DEM for a declaratory ruling on the underlying evidentiary issue (*viz.*, the type of questions which DEM employees would be required to answer). The director thereafter issued an order requiring DEM witnesses to answer *only* "fact-specific, 'non-opinion' inquiries." The Attorney General subsequently appealed that order to the Superior Court. The December 31, 2007 Superior Court order referenced in the text is the product of the Attorney General's appeal of the order of the director of DEM.

We further note that, during the period of more than two years that transpired between the posing of the objected-to question at the AAD hearing and the Superior Court's eventual ruling, the parties appeared in the Superior Court on several occasions and before various justices of the Superior Court. The parties were repeatedly encouraged by said justices to pursue settlement—although in the end that pursuit was unsuccessful.

7. We pause to note that the December 31, 2007 order of the Superior Court has neither been appealed to this Court, nor is it the subject of the present appeal before this Court. We therefore consider that order to be unaffected by this decision and to remain in full force and effect.

ly deemed to be invalid, the 'renewal' of such license is impacted." The Attorney General also argued against the mootness contention on the ground that the appeal involved issues that are of extreme public importance that are capable of repetition, but which will evade review. In addition, he contended that the appeal was not time-barred by the doctrine of laches, due to the fact that the stay of administrative proceedings pending the termination of the Superior Court proceedings had been agreed upon by all parties; he further noted that Pond View had proffered no proof of either unreasonable delay or prejudice (both of which are requisite elements of a meritorious claim of laches).

On January 4, 2008, the AAD hearing officer made the following findings of fact: (1) DEM issued Pond View a license to operate a Construction and Demolition Debris Processing Facility on January 10, 2003; (2) the Attorney General filed an appeal from the issuance of that license on April 1, 2003; (3) the license at issue had expired on January 10, 2006; (4) on January 10, 2006 "a new license to operate [a facility] was issued" by DEM to Pond View; and (5) there had been no appeal filed with the AAD regarding the new license.

Based upon the just-summarized findings of fact, the AAD hearing officer issued an order and decision dismissing the appeal as moot. She held that, pursuant to § 23–18.9–9 and the terms of the license, the 2003 license expired on January 10, 2006. She further ruled that the Attorney General had "failed to preserve [his] right to challenge the validity of the 2006 license." Accordingly, she concluded that the appeal as to the validity of the

2003 license issued to Pond View had been rendered moot.

In February of 2008, shortly after the AAD hearing officer issued her mootness decision, the Attorney General, in reliance upon chapter 35 of title 42 of the General Laws of 1956, filed a two-count complaint in the Providence County Superior Court, naming both DEM and Pond View as defendants.[8] In count 1 of the amended complaint (entitled "Administrative Procedures Act Appeal"), the Attorney General sought review of the AAD's mootness decision with respect to the 2003 license. In count 2 (entitled "Request For Declaratory Judgment"), the Attorney General sought a declaratory judgment with respect to the validity of the 2006 license. He further alleged that he has "an interest under state law in the legality of licenses issued by [DEM] and compliance with the applicable statutory requirements governing such licenses;" he alleged that he has therefore been "adversely affected by the regulations used by [DEM] in the conduct of its administrative hearings." The Attorney General also contended that he had an interest in "ensuring that due process of law is afforded to those engaged in [DEM] administrative hearings."

Pond View answered the Attorney General's complaint, and it filed a lengthy responsive pleading that included a section entitled "Counterclaims," which contained several counts. In one count, Pond View sought compensation for its litigation expenses pursuant to the statute entitled "Equal Access to Justice for Small Businesses and Individuals," G.L. 1956 § 42–92–1; other counts alleged abuse of process and malicious prosecution.

During the course of the just-referenced Superior Court proceedings, TLA pur-

---

**8.** The Attorney General's original complaint named DEM as the only defendant. He subsequently filed an amended complaint, approximately one week later, in which he added Pond View as a defendant.

chased the assets of Pond View. On February 28, 2008, as a result of that asset purchase and upon TLA's application to DEM for a license transfer, the license was transferred to TLA; and that entity was issued a three-year renewal license (which in the normal course will expire on February 28, 2011).[9] As a result, TLA became licensed to operate the same facility as its predecessor in interest (Pond View) had operated. In March of 2008, TLA was substituted as a party defendant in place of Pond View in the Superior Court action.[10]

On May 29, 2008, a justice of the Superior Court issued a decision with respect to count 1 of the Attorney General's complaint (entitled "Administrative Procedures Act Appeal") and with respect to count 2 of the complaint (entitled "Request For Declaratory Judgment"). At the outset, the trial justice stated, as he had on previous occasions, that he considered the "internal friction within the executive department of government" to be "unseemly." He expressed his particular displeasure over the fact that this matter had returned to the Superior Court without there having been compliance with the "[c]ourt's direction that the witnesses respond to the questions" and "without any further evidence [having been] taken * * *." We agree with his observations.

The trial justice then began his review of the AAD hearing officer's decision by quoting on the record the portion of § 23–18.9–9(c) which states that licenses issued pursuant to that statutory provision "shall expire three (3) years from the date of issuance unless sooner suspended or revoked." He found that the 2003 license, which was the focus of the Attorney General's administrative appeal, had been effective for a span of time commencing on January 10, 2003 and ending on January 10, 2006. The trial justice also found that the license was subsequently renewed on January 10, 2006 and in the normal course would have remained in effect until January 10, 2009. The trial justice further found that, as a result of the change in ownership, a license had been issued to TLA on February 28, 2008; he noted that the latter license would expire on February 28, 2011. (See footnote 9, *supra.*)

Although the trial justice gave consideration to the Attorney General's argument that license renewals "are built on the original license and [are therefore] nothing more than continuances of * * * that original license, [and that,] therefore, an attack on the foundation continues on with respect to the rest of the chain," the trial justice ultimately disagreed with that argument. He stated that, if the Attorney General had "appealed or done something to stop the issuance of the '06 license," the case might not have become moot. The trial justice further stated that, in his view, the plain language of the licensing statute "makes it clear that it is not a continuance." The trial justice summarily stated: "It is not the same license." He reasoned that "it was incumbent upon [the Attorney General] either to ask [the Superior Court]

---

9. DEM agency regulations provide that, when a change of ownership of a facility takes place, a license transfer occurs and DEM is to issue the transferee "a full term [*i.e.*, three year] renewal license." 12–030–021 R.I.Code R. § 1.6.03(a)(3); GL.1956 § 23–18.9–9(c).

10. In January of 2009, TLA filed an application with DEM whereby it sought permission to expand its facility and to allow it to process additional tonnage of refuse per day. Pursuant to the licensing statute, expansion of an existing facility requires a new license; accordingly, the procedural steps relative to the issuance of such a license must be adhered to. *See* § 23–18.9–9(a)(1). As of the time of oral argument before this Court, the application for the new license remained under review.

or the director or the hearing officer or somebody to stay the issuance of the renewed license [in 2006]" On the basis of this reasoning, the trial justice affirmed the AAD hearing officer's judgment of dismissal of the administrative appeal on the ground that the issue of the validity of the 2003 license was moot.[11]

On July 14, 2008, the trial justice caused to be entered an order affirming the decision of the hearing officer and dismissing the Attorney General's administrative appeal (count 1). TLA then filed a motion for entry of partial final judgment, pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure. On September 3, 2008, over the objection of the Attorney General, partial final judgment was entered pursuant to Rule 54(b) with respect to the administrative appeal (count 1). On that same day, the trial justice caused to be entered a judgment dismissing the declaratory judgment count contained in the Attorney General's complaint (count 2).

The Attorney General filed a notice of appeal to this Court with respect to the Superior Court's dismissal of his claim for declaratory judgment (count 2) and the entry of final judgment pursuant to Rule 54(b); he additionally filed a petition for a writ of certiorari, in which he sought review of the Superior Court's dismissal of his administrative appeal (count 1). We granted the Attorney General's petition for a writ of certiorari, consolidated both the appeal and the certiorari petition, and spe-cifically directed the parties to address the question of mootness.[12]

In the case at bar, our role is to determine whether or not the Attorney General's appeal of the 2003 license is moot.

## II

### Standard of Review

■ When this Court reviews issues pursuant to a writ of certiorari, "this Court conducts a *de novo* review with respect to all applicable questions of law." *Irons v. Rhode Island Ethics Commission,* 973 A.2d 1124, 1129 (R.I.2009); *Henderson v. Newport County Regional Young Men's Christian Association.* 966 A.2d 1242, 1245 (R.I.2009) ("When a case is before this Court on a writ of certiorari, our review is limited to examining the record to determine if an error of law has been committed.") (internal quotation marks omitted). In carrying out this review, "[w]e do not weigh the evidence * * *, but only conduct our review to examine questions of law raised in the petition." *Crowe Countryside Realty Associates, Co., LLC v. Novare Engineers, Inc.,* 891 A.2d 838, 840 (R.I.2006); *see also Henderson,* 966 A.2d at 1246.

## III

### Analysis

■ We are now called upon to resolve the competing arguments as to mootness. We have frequently "recognized the need,

---

11. The Superior Court justice concluded his decision with the following blunt admonition: "[When the Superior Court] issues orders, they are not to be ignored. In the event that end runs are going to be attempted around them, the Court through appropriate motion practice ought to be made aware of it before it happens."
It should go without saying that we unequivocally share in the displeasure voiced by the Superior Court justice.

12. The mootness issue is properly before us as a result of our having granted the Attorney General's petition for a writ of certiorari; and, given our holding as to the mootness issue, we need not address the competing arguments of the parties as to the appropriateness of the Superior Court's entry of partial final judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure.

apart from certain exceptional circumstances, to confine judicial review only to those cases that present a ripe case or controversy." *City of Cranston v. Rhode Island Laborers' District Council, Local 1033*, 960 A.2d 529, 533 (R.I.2008); *see also State v. Lead Industries Association, Inc.*, 951 A.2d 428, 469–70 (R.I.2008). A question is moot if a court's "judgment would fail to have a practical effect on the existing controversy * * *." *City of Cranston*, 960 A.2d at 533; *see also H.V. Collins Co. v. Williams*, 990 A.2d 845, 847 (R.I.2010); *Morris v. D'Amario*, 416 A.2d 137, 139 (R.I.1980).

We begin our analysis by examining the provisions of § 23–18.9–9, pursuant to which the 2003 license and subsequent renewal and transfer licenses were issued. When an applicant seeks to obtain a license for the construction or operation of a solid waste management facility, such applicant must submit to the director of DEM an application and various certifications relative to legal compliance and approval by various government entities. Section 23–18.9–9(a)(1). After the application has been received, notice is provided to the public with respect to the draft license, and informational workshops are held. Section 23–18.9–9(a)(2)(3). Thereafter, a hearing is held for the purpose of public comment, and written comments may be submitted to DEM for an additional period of time. Section 23–18.9–9(a)(4). Within ninety days of the close of the public comment period, the director is required to either issue the license or indicate that there has been a final denial of same. Section 23–18.9–9(a)(5). The statute provides that "[t]he applicant and/or any person who provided substantive comment at any time during the public comment period may appeal the decision of the director" with respect to the issuance or denial of the license. Section 23–18.9–9(a)(6).

Pursuant to the statute, "[l]icenses shall expire three (3) years from the date of issuance unless sooner suspended or revoked." Section 23–18.9–9(c). However, it further provides that

> "[t]he provisions in this section for issuance of a license *shall not apply to the renewal* of a license and any facility shall be relicensed if it meets the criteria in effect when the facility was licensed; provided, however, that any renewal application which substantially deviates from the use or purpose of the license shall be subject to the provisions of this chapter * * *." *Id.* (Emphasis added.)

■ Both DEM and TLA contend on appeal that the issue of the validity *vel non* of the 2003 license is moot because that license expired in 2006, at which time a renewal license was issued for another three-year period; they further contend that the latter license was replaced by yet another license at the time of the transfer in 2008. They note that the 2006 and 2008 licenses each contain conditions that are different from each other and from the 2003 license.

After due consideration of the respective contentions of the parties, our understanding of the above-quoted portion of § 23–18.9–9(c) has led us to a conclusion that is quite different from that reached by the trial justice and the AAD hearing officer. In our view, the 2006 and 2008 licenses are in actuality *inherently linked to and dependent upon* the validity of the original 2003 license—as opposed to being truly new licenses. When the matter is so viewed, the issue of the validity (*vel non*) of the original license has not become moot by virtue of its having been rendered a dead letter for all purposes; its initial validity may still be challenged, even

though it survives only in the form of the 2006 and 2008 permutations.

We understand § 23–18.9–9(c) to mean that, once an original license has been granted (after the completion of the above-described extensive application process consisting of documentation, notice, hearing, and comment), the requirements and the process for renewal and for transfer are essentially *pro forma*, absent a substantial deviation with respect to the use or purpose of the facility. An applicant for a renewal license (or a license transfer) is *not* required to provide the director with a certificate from the municipality in which the proposed site is located, stating that the facility conforms with the "applicable local land use and control ordinances of the municipality;" and such an applicant is not required to provide a "certificate of approval of the proposed site issued by the state planning council;" nor is an applicant for a renewal or transfer license subject to the same public notice and comment requirements—whereas *all* of the foregoing are required in order to obtain a new license. *See* § 23–18.9–9(a)(1) through (4) and (c).

For these reasons, we are unpersuaded by the contention of DEM and TLA that the licenses which were issued in 2006 and 2008 were entirely separate and distinct from the original 2003 license.[13] We conclude instead that, as the Attorney General has contended, pursuant to the system of licensing for these solid waste facilities, "[t]he validity of the license which [DEM] 'renewed' in January of 2006 obviously depends on the validity of the *original* license * * *."[14]

DEM has also contended that this Court's decision, in *Hallsmith–Sysco Food Services, LLC v. Marques*, 970 A.2d 1211 (R.I.2009), supports the contention that the issue of the 2003 license is moot. However, we consider that case to be factually distinguishable from the present case. In *Hallsmith–Sysco Food Services*, we held that the town's elimination of a liquor license rendered moot the issue of the plaintiff's attempts to file a notice of objection to the future transfer of that liquor license. *Id* at 1213–14. By contrast, in the instant case, although the original 2003 license expired by its own terms, that license was at the time of initial expiration renewed and was subsequently transferred.[15] Therefore, unlike the situation in *Hallsmith–Sysco Food Services*, the issue of the validity (*vel non*) of the original 2003 license continues to be ripe for review.

 Both the trial justice and defendants noted that the Attorney General had not appealed or taken other action in an effort to prevent the issuance of the subsequent 2006 license or the 2008 transfer. Although there may hypothetically have been judicial remedies of which the Attor-

---

13. Although it is by no means dispositive of the issue of whether the 2006 and 2008 licenses are in actuality closely related offshoots of the original 2003 license, it is worth noting that each of the licenses bears the same "64" license number.

14. We further consider to be persuasive the Attorney General's argument that, if the 2006 and 2008 licenses were indeed "new" (as DEM and TLA contend they were), then there was not compliance with the above-referenced statutory requirements before those licenses were issued.

15. We note that our analysis is similar to that conducted by the Supreme Court of Texas in the case of *Harris County Bail Bond Board v. Blackwood*, 41 S.W.3d 123 (Tex.2001). In *Blackwood*, the court noted that it had "long held that the expiration of a license will not moot the controversy if the appeal arises from the renewal or refusal to renew a license under a statutory scheme that contemplates a continuous cycle of license renewals." *Id* at 126 n. 2.

ney General could have availed himself in an effort to prevent the renewal of the license in 2006, we are unconvinced that the Attorney General's option not to avail himself of such purported remedies renders the issue of the 2003 license moot.

In our view, the statutory scheme pertinent to the case at bar provides no mechanism for the Attorney General as an objector (or for any other objector) to the renewal or transfer of the license to have contested or appealed the 2006 or 2008 licenses. As previously indicated, the statute governing new licenses provides that "[t]he applicant and/or any person who provided substantive comment at any time during the public comment period may appeal the decision of the director * * *." Section 23–18.9–9(a)(6).[16] Since the statutory requirements for renewal and transfer are far more truncated than are those governing the issuance of new licenses, we conclude that the Attorney General had no meaningful recourse but to continue to pursue his challenge to the underlying 2003 license (which he had the statutory right to appeal since he had provided substantive comment in opposition to the issuance of the license).

We are further unpersuaded by DEM's argument that, because each license that was issued contained different conditions, the post–2003 licenses could not be considered to be the same as the 2003 license— and that therefore the controversy as to the validity of the 2003 license became moot three years after its issuance. We view DEM's own reasoning (that, because "solid waste facilities frequently modify their operations during the three year lifespan of their license * * * [and] [s]o long as those modifications do not change the overall nature or capacity of the operation, then the license will be renewed and the License Conditions will be revised to reflect those modifications") as actually indicating that the validity of subsequent renewals *are* in fact based upon the validity of the original license. In our view, the different conditions on the various licenses are meant to address the changes that such facilities undergo over time, but which fall well below the substantial deviations that trigger the requirement of a "new" license.[17] *See* § 23–18.9–9(c). Thus, absent such substantial deviations, the renewed licenses are in fact a product of the issuance of the original license, which, in the case at bar, was the 2003 license.[18]

16. DEM regulations provide an opportunity for hearing for "[a]ny person whose application for a registration, registration renewal, license, license renewal, other approval, or a variance *has been denied* by the Department, acting through the Office of Waste Management * * *." 12–030–021 R.I.Code R. § 1.11.01 (emphasis added). Such person "may appeal to the Administrative Adjudication Division for review of the decision on which the denial is based." *Id.*

Our reading of this regulation leads us to conclude that, had Pond View or TLA been denied either a renewal or a transfer of the license, the entity so denied would have had the opportunity to appeal the denial through the AAD hearing process. However, it is our view that the provision provides no mechanism for the Attorney General, or other inter-

ested parties, to object to or appeal the issuance of a renewal or transfer.

17. With respect to a transferred license, DEM regulations provide that a change in ownership which entails "significant amendments and/or revisions to the operating plan or facility will require the issuance of a *new license* or registration (versus renewal)." 12–030–021 R.I.Code R. § 1.6.03(a)(2) (emphasis added).

18. Although it is certainly regrettable that a controversy about the issuance of a license in 2003 still remains unresolved, we perceive nothing in the present record that would support a successful invocation of the doctrine of laches. *See Cavanagh v. Bostitch, Inc.*, 91 R.I. 239, 253, 162 A.2d 785, 792 (1960).

For the reasons set forth above, we conclude that the administrative appeal concerning the issuance of the 2003 license is not moot.

## IV

### Conclusion

For the foregoing reasons, the petition for certiorari is granted, the judgment of the Superior Court is hereby quashed, and the papers in this case are remanded to the Superior Court with instructions that it, in turn, remand this matter to the Administrative Adjudication Division for Environmental Matters of the Department of Environmental Management for further proceedings to commence expeditiously in a manner consistent with this opinion and the December 31, 2007 order of the Superior Court.

Justice INDEGLIA took no part in the consideration or decision of this appeal.